United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ROBERT LOUIS ALTES,**<br><br>                    Plaintiff,<br><br>          v.<br><br>**SANDRA PENNYWELL,**<br><br>                    Defendant. | Case No.  13-cv-04522-YGR<br><br>**ORDER DENYING PETITION FOR HABEAS CORPUS RELIEF** |

Now before the Court is petitioner Robert Louis Altes's ("Altes") petition for writ of habeas corpus.  (Dkt. No. 1 ("Petition").)  The government has answered (Dkt. No. 8 ("Answer")), and petitioner has replied (Dkt. No. 13 ("Reply")).  For the reasons stated below, the petition for such relief is **DENIED**.

## I.       FACTUAL BACKGROUND

In 2009, a Contra Costa County jury found petitioner guilty of second degree murder with an enhancement for personal use and discharge of a firearm.  Petitioner was sentenced to a term of 40 years to life.  On December 7, 2011, the state court of appeals for the first appellate district denied his appeal in a reasoned decision.  *People v. Altes*, 2011 WL 6089716 (Cal. Ct. App. Dec. 7, 2011).  On February 2, 2012, the state supreme court denied review.  This federal habeas petition followed.

The facts relating to petitioner's convictions, as set forth by the California state court of appeal, are as follows:

### Gutierrez's Death

Altes lived in Brentwood with his parents, Louis and Virginia, at the time of these events.  Gutierrez occasionally stayed in a camper on the property.  Altes suspected Gutierrez was stealing tools from him

to sell so he could have money to buy drugs.

On the day of the shooting, Altes heard Gutierrez was on the property and confronted him about the missing tools.  Altes was armed with a .22 caliber handgun.  In a little while he came back inside carrying a broken pellet rifle.  The barrel was twisted and falling apart.  He threw the gun on a couch and said: "He tried to kill me with it so I shot him."

Altes then went next door to the home of Brenda Smith and Andy Gartelman.  He told Smith and Gartelman that he thought he had shot someone.  The three of them went outside, where Gutierrez was lying on the ground near the barn.  Gutierrez was saying, "it hurts, it hurts," but Smith thought that except for a small scratch on his face he looked fine.

Smith called Gutierrez's friend, Michael Molina, and told him to hurry over because Gutierrez had been shot.  Molina arrived within minutes with his girlfriend, Carissa Trolesi, and Sean Winn.  Gutierrez was rolling on the ground, clutching his stomach and moaning in pain.  He looked like he had been badly beaten.  There was a cut on his forehead, his lips were white, and his eyes were wide open.  Altes was spraying Gutierrez with a garden hose, saying "get up you worthless piece of shit" and "get him out of here or I'm going to dump him in the delta."  Altes said he had beaten Gutierrez for stealing his tools and he refused to call 911 because he "didn't want to go to jail over this piece of shit."

Others felt differently.  Trolesi called 911 from her cell phone.  The group decided that Altes would drive Gutierrez to a nearby Valero station and Molina would wait with him there for the ambulance.

Molina, Winn and Trolesi drove to the gas station and waited for Altes and Gartelman to follow with Gutierrez.  Altes did not turn up, so Molina and Winn drove back to the property to look for him.  They saw his van coming down the driveway, so they drove back to the Valero station and arrived around the same time as an ambulance and police.  Altes drove by the Valero station without stopping, pulled into a different gas station, then turned around and headed back toward the Valero station.  Molina, Winn and Trolesi pointed him out to the police as he passed by.  An officer flagged Altes into the Valero station.  Gutierrez's body was found on the floorboard behind the front seat, underneath a large garbage bag.

Altes told Winn that he "could have waited a bit" before calling 911.  Winn was angry and scared.  He yelled at Altes, "What the fuck is wrong with you?  Over a fucking chain saw and a weed whacker.  What the fuck?"

2

**The Investigation**

Gutierrez died from a single gunshot wound that severed a major artery in his lower abdomen.  Forensic pathologist Dr. Icheki Ogan testified that blood loss from the gunshot wound would have caused incapacitation and death within minutes.  There were scrapes and a laceration on Gutierrez's head and neck, sand in his mouth, nose and hair, and an injury on his left hand that was probably defensive.  None of Gutierrez's injuries suggested he had been involved in a life or death struggle with a larger man.  Tests for drugs and alcohol were negative.

Police found a broken pellet gun in the Altes's living room.  His father said Altes told him Gutierrez tried to shoot him with the pellet gun, but that Altes took it away and used it to beat Gutierrez.  Officers found a .22 caliber Smith & Wesson revolver on a dresser in Altes's bedroom.  One bullet had been fired.

Firearms expert Chris Coleman testified that Gutierrez was shot from a distance of 18 to 36 inches, but he could not conclusively identify the .22 Smith & Wesson retrieved from Altes's bedroom as the murder weapon or determine whether the shooting was in self-defense.  The .22 did not misfire when he tested it.  Coleman testified that a BB gun or pellet gun can misfire.

**Altes's Statement**

Altes was interviewed by police the evening of the shooting.  The jury was shown a video of the interview.  In it, Altes said he went outside to warn Gutierrez that he had 24 hours to return the stolen tools.  He went back into the house and loaded a .22 revolver with one round, because "that's all it takes" to either warn or to kill.  Gutierrez was in Altes's workshop when he returned.  He tried to fire a warning shot, but the gun misfired.  Gutierrez grabbed a pellet rifle and tried to shoot at Altes, but the pellet rifle also misfired.

Gutierrez began swinging the pellet rifle like a club, hitting Altes once on the shoulder and breaking the barrel.  Altes aimed his revolver at Gutierrez's groin, intending to shoot him in "[h]is balls, his huevos," and pulled the trigger.  Gutierrez fell to the ground.  Altes returned to the house with the pellet gun and told his parents he had shot Gutierrez because Gutierrez tried to shoot him with it.
Altes immediately went to Gartelman and Smith's house, pounded on the door and told them he had shot Gutierrez.  They went back to where Gutierrez was lying on the ground.  When Molina arrived, Altes told him to "get this piece of shit out of here, would you."  Molina suggested they drop Gutierrez at a bus stop, but Altes thought they should take him to an emergency clinic.

3

United States District Court
Northern District of California

They moved Gutierrez to Altes's van, hitting his head on a wood burning stove and a bench in the process. Then they drove to a Savers gas station to buy gas before they turned around toward the hospital. Altes voluntarily pulled into the Valero station when he saw the police were there.

Altes told police, "I'd do the same God damn thing again, except with a bigger weapon. If I could change back time, I'd've [sic] used a bigger gun. [¶] That's the only thing I'm sorry for; not whipping out the heavy artillery."

**Defense Case**

Altes maintained that he shot Gutierrez in self-defense after Gutierrez attacked him with the pellet gun as he lawfully defended his property. Doris Logoteta testified that her granddaughter, Trina Velasco, had been Gutierrez's girlfriend and was the mother of his child. On January 1, 2006 Logoteta woke up to hear Velasco and Gutierrez fighting. She called 911. Velasco was crying and had blood on her face and mouth. Gutierrez was yelling profanities and trying to leave the apartment with the baby. Logoteta told the police investigator that Gutierrez was short, but strong for his height.

Jeff Pontes is married to Velasco's mother. He and his wife have custody of Velasco and Gutierrez's young son. In June 2006 his wife filed a police report about receiving a threatening telephone call from Gutierrez.

Brentwood detective Veronica Bettger testified that Carissa Trolesi was placed under surveillance for suspected methamphetamine sales in July 2007, although she was never arrested.

**Jury Verdict and Sentencing**

The jury convicted Altes of second degree murder and found true an allegation that he personally used and discharged a firearm. The court sentenced him to a total term of 40 years to life in prison.

## II.   STANDARD OF REVIEW

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (1996). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the

United States District Court
Northern District of California

1    claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

2    clearly established Federal law, as determined by the Supreme Court of the United States; or (2)

3    resulted in a decision that was based on an unreasonable determination of the facts in light of the

4    evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  The first prong applies

5    both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529

6    U.S. 362, 407–09 (2000), while the second prong applies to decisions based on factual

7    determinations.  *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003).

8         A state court decision is "contrary to" Supreme Court authority, that is, falls under the first

9    clause of section 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

10   reached by [the Supreme] Court on a question of law or if the state court decides a case differently

11   than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams (Terry)*, 529

12   U.S. at 412–13.  A state court decision is an "unreasonable application of" Supreme Court

13   authority, falling under the second clause of section 2254(d)(1), if it correctly identifies the

14   governing legal principle from the Supreme Court's decisions but "unreasonably applies that

15   principle to the facts of the prisoner's case."  *Id.* at 413.  The federal court on habeas review may

16   not issue the writ "simply because that court concludes in its independent judgment that the

17   relevant state-court decision applied clearly established federal law erroneously or incorrectly."

18   *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ.

19   *Id.* at 409.

20        The state court's decision is reviewed for conformity with Supreme Court precedents that

21   existed at the time of that decision.  *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011).  Section

22   2254(d)(1) requires federal courts to "focu[s] on what a state court knew and did," and to measure

23   state-court decisions "against this Court's precedents *as of '*the time the state court renders its

24   *decision.*'"  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1399 (2011) (quoting *Lockyer v. Andrade*, 538

25   U.S. 63, 72 (2003).).

26        Under section 2254(d)(2), a state court decision "based on a factual determination will not

27   be overturned on factual grounds unless objectively unreasonable in light of the evidence

28   presented in the state-court proceeding."  *See Miller–El*, 537 U.S. at 340; *see also Torres v.*

1   *Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). Even if constitutional error is established, habeas

2   relief is warranted only if the error had a "substantial and injurious effect or influence in

3   determining the jury's verdict." *Penry v. Johnson*, 532 U.S. 782, 784 (2001) (quoting *Brecht v.*

4   *Abrahamson*, 507 U.S. 619, 637 (1993).).

5   **III.    DISCUSSION**

6          As grounds for federal habeas relief, petitioner asserts the following four claims: (1) his

7   rights under the confrontation clause were violated when one expert testified as to the results of

8   another non-testifying expert's report; (2) his due process rights were violated when the trial judge

9   reconsidered pretrial evidentiary motions that had previously been decided by the judge initially

10  assigned to the case; (3) his due process rights were violated when the trial court limited the

11  admission of evidence concerning the decedent's thievery and drug use; and (4) his rights under

12  the Sixth Amendment were violated by trial counsel's failure to present a defense on petitioner's

13  behalf. The Court addresses each in turn.

14  **A. First Claim: Violation of Confrontation Clause**

15  **1.    Testimony Based on Autopsy Report**

16         In his first claim, Altes argues that his Sixth Amendment right to confront the witnesses

17  against him was denied when Dr. Ogan testified about his opinions regarding the victim's injuries

18  and cause of death based on an autopsy performed, and report generated, by a different

19  pathologist, Dr. Peterson (the "Peterson Report").[1]

20         The state court of appeal considered this issue and addressed it as follows:

21
22         Dr. Brian Peterson conducted an autopsy on Gutierrez and prepared
           a report. By the time of trial he had moved out of state, and Dr.
23         Ogan, one of his former medical partners, testified as the

---

24         [1] The Court notes that petitioner is challenging the state court's admission of Dr. Ogan's
25  testimony at trial, not the admission of the autopsy report itself. Likewise, the state court of
    appeal determined that petitioner did not challenge the admission of the report on direct appeal.
26  *See People v. Altes*, No. A125038, 2011 WL 6089716, at *5 n. 2 (Cal. Ct. App. Dec. 7, 2011)
    ("perhaps because defense counsel explicitly withdrew his initial objection to its admission at
27  trial"); *see also* RT 1240 (initial objection to report on hearsay grounds), 1254 (counsel withdrew
    objection and agreed to admission of report into evidence).)
28

United States District Court
Northern District of California

prosecution's expert in his stead. Altes contends that permitting Dr. Ogan to testify in reliance on Dr. Peterson's findings violated his Sixth Amendment right to confront the witnesses against him. He relies primarily on *Crawford v. Washington* (2004) 541 U.S. 36, 51 [124 S.Ct. 1354; 158 L.Ed.2d 177] (*Crawford* ) and *Melendez–Diaz v. Massachusetts* (2009) —— U.S. —— [129 S.Ct. 2527, 174 L.Ed.2d 314] (*Melendez–Diaz* ). In *Melendez–Diaz,* the United States Supreme Court held that *Crawford* bars the admission of affidavits reporting the results of forensic tests of substances for narcotics unless the analyst who performed the tests is available for trial or the defendant was afforded a prior opportunity for cross-examination. But neither *Crawford, Melendez–Diaz* nor the more recently decided *Bullcoming v. New Mexico* (2011) —— U.S. —— [131 S.Ct. 2705, 180 L.Ed.2d 610] (*Bullcoming* ) is determinative here.

In *Crawford, supra,* the United States Supreme Court held the Sixth Amendment right of confrontation is violated by the admission of testimonial statements of a witness who is not subject to cross-examination at trial unless the witness is unavailable to testify and the defendant had a previous opportunity for cross-examination. (541 U.S. at p. 68.) *Melendez–Diaz* applied the *Crawford* rationale to hold that a forensic analyst's report of tests of a substance for the presence of illegal drugs was a testimonial statement for Sixth Amendment purposes. (*Melendez–Diaz, supra,* 129 S.Ct. at p. 2532.) Most recently, the court held in *Bullcoming, supra,* 180 L.Ed.2d at pp. 619–620, that the introduction of a blood-alcohol analysis report through the testimony of a forensic analyst who did not perform, observe or certify the analysis violated the defendant's confrontation right.

Under these cases, the conclusion is all but inescapable that a pathologist's report on the autopsy of an apparent homicide victim—like Dr. [Peterson]'s report here—is testimonial under the Sixth Amendment. Altes's contention here, however, is not challenging, or at least is not primarily addressed to, the admission of Dr. Peterson's report. Rather, he contends that *Crawford* and *Melendez–Diaz* compelled the exclusion of *Dr. Ogan's* expert testimony about the manner and cause of Gutierrez's death. In allowing that testimony, Altes maintains "the court improperly precluded [him] from examining the percipient witness whose observations of the injuries formed the basis for critical conclusions regarding whether the crime committed was murder."

We disagree. This is not a case in which the testifying expert was a mere conduit for forensic information prepared and analyzed by someone else, as in *Bullcoming*. Here, instead, the main thrust of Dr. Ogan's testimony expressed his independent interpretation of the postmortem photographs and x-rays through the lens of his

knowledge and experience. Specifically, his testimony that Gutierrez's facial abrasions were postmortem drag-type marks from a "rough surface," consistent with dragging a body face down, was not based on any descriptions, statements or tests by Dr. Peterson, but on the photographs depicting those wounds. The same is true for Dr. Ogan's key testimony that Gutierrez's hand injury was probably defensive; that he would have bled to death within minutes of being shot; and that the bullet wound would probably have caused some external, as well as internal, bleeding. Dr. Ogan's opinion that people can be killed by .22 caliber guns as easily as by larger weapons was based only on his professional experience. The accusatory opinions in this case, thus, were reached and conveyed not on the basis of the nontestifying pathologist's testimonial statements, but through the testifying expert's independent assessment of photographs and other nontestimonial evidence. (See *People v. Geier, supra,* 41 Cal.4th at pp. 607 (maj.opn.); see *id.* at p. 622 (conc. opn. of Werdegar, J.).)

More questionable under *Melendez–Diaz* and *Bullcoming* is other testimony in which Dr. Ogan related Dr. Peterson's descriptions of Gutierrez's injuries and his opinions about the cause of death to the jury. But, assuming this testimony ran afoul of the Sixth Amendment, it was not prejudicial. First, Dr. Peterson's findings and conclusions were, for all intents and purposes, no different than Dr. Ogan's independent assessment of Gutierrez's injuries. Moreover, there was overwhelming nonexpert evidence against Altes—including his videotaped statements that he intentionally shot at Gutierrez's "cojones" and that his only regret was not using a bigger gun, as well as testimony by percipient witnesses about Altes's brutal treatment of Gutierrez after he shot him. While Dr. Ogan's testimony about Dr. Peterson's findings may have had some cumulative value, we think it is clear beyond a reasonable doubt on this record that only one verdict was possible with or without it. (See *People v. Geier, supra,* 41 Cal.4th at p. 608 [*Chapman* analysis of confrontation clause violations].)

*Crawford's* redirection of confrontation clause analysis to the testimonial nature of out-of-court statements has given rise to cogent Sixth Amendment concerns about expert testimony that depends for its validity and value on the truth of testimonial statements by nonwitnesses. (See *People v. Hill* (2011) 191 Cal.App.4th 1104, 1134–1137; *People v. Goldstein* (2005) 6 N.Y.3d 119, 126–129 [810 N.Y.S.2d 100, 843 N.E.2d 727]; Mnookin, *Expert Evidence and the Confrontation Clause after Crawford v. Washington* (2007) 15 J.L. & Pol'y 791, 815–830; see also *Bullcoming, supra,* 180 L.Ed.2d at p. 629 (conc. opn. of Sotomayor, J. [observing that *Bullcoming* leaves open the constitutionality of expert testimony based on testimonial statements by others] ).) But that issue is not presented here. Dr. Ogan's opinions were not rooted in Dr. Peterson's

findings or conclusions.  Altes had a full opportunity to test Dr. Ogan's opinions on cross-examination and to explore any weaknesses in his conclusions and discrepancies between the evidence on which his assessments were premised.  To the extent the people were able to put Dr. Peterson's report before the jury through Dr. Ogan's testimony, the error was harmless.

*Altes*, 2011 WL 6089716, at *3–6.

### 2.  Legal Standard

The confrontation clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend. VI. The purpose of the confrontation clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  *Crawford v. Washington*, 541 U.S. 36, 61 (2004).  It commands that the reliability of evidence be assessed in a particular manner: by testing in the crucible of cross-examination.  *Id.*; *see also Davis v. Alaska*, 415 U.S. 308, 315–16 (1974).

The confrontation clause applies to all "testimonial" statements.  *Crawford*, 541 U.S. at 50–51.  "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact."  *Id.* at 51.  When the primary purpose of using an out-of-court statement is to create an out-of court substitute for trial testimony, the statement is testimonial hearsay and *Crawford* applies.  *Michigan v. Bryant*, 562 U.S. 344, —, 131 S. Ct. 1143, 1155 (2011); *see, e.g.*, *Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2712–14 (2011) (concluding that forensic lab report, prepared in connection with a criminal investigation and certifying that petitioner's blood alcohol level was above limit for aggravated DUI, was testimonial); *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 310, 329 (2009) (holding a sworn certificate from a crime lab analyst identifying a controlled substance qualified as testimonial evidence because it was created for the purpose of establishing or proving some fact in trial and it was functionally identical to in-court testimony).  When that is not the primary purpose, "the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Bryant*, 131 S. Ct. at 1155.

### 3. Analysis

#### a. Overview

Altes contends that by permitting Dr. Ogan to testify regarding the Peterson Report, he was deprived of his Sixth Amendment right. (Dkt. No. 1 at 13.) The core of Altes's argument rests on his contention that Dr. Ogan was a surrogate for Dr. Peterson, or a mere conduit for testimony that should have been provided by Dr. Peterson, and for which Altes had a right to cross-examine Dr. Peterson.

In opposition, the government contends that at the time of the court of appeals' decision, there was no clearly established Supreme Court authority holding that expert testimony based on an autopsy report prepared by a different pathologist should be considered testimonial under the Confrontation Clause. In addition, the government argues that much of Dr. Ogan's testimony was based on his independent assessment of evidence of record; he was not a mere conduit for the opinions and findings of an unavailable witness, and he was available for cross-examination. Finally, the government urges that even if a Confrontation Clause violation occurred, any error was harmless because the record contained overwhelming evidence of the defendant's guilt.

Having reviewed the arguments of the parties, the relevant authority, and the record in this case, the Court finds that with respect to certain statements, Dr. Ogan merely transmitted testimonial statements of Dr. Peterson, and that this was a Sixth Amendment violation. Notwithstanding the foregoing, the Court ultimately agrees with the court of appeals and finds that given the constitutional uncertainty existing with respect to the scope of the Confrontation Clause, and given that there is no evidence of prejudice, petitioner is not entitled to habeas relief.

#### b. Developing Landscape

As many courts have acknowledged, the question of whether certain types of statements are "testimonial" and thus fall within the scope of the Confrontation Clause remains an area of significant jurisprudential development. At the time the state appeals court considered Altes's argument, the relevant Supreme Court authority on the contours of statements qualifying as "testimonial" consisted of *Crawford v. Washington*, 541 U.S. 36 (2004), *Melendez–Diaz v.*

United States District Court
Northern District of California

*Massachusetts*, 557 U.S. 305 (2009), and *Bullcoming v. New Mexico*, 131 S.Ct. 2705 (2011).[2]

In *Crawford*, the Supreme Court held that testimonial out-of-court statements are barred under the Confrontation Clause unless the witness was unavailable and the defendant had a prior opportunity to cross-examine the witness. *Id.* at 59. The court explained "testimony" for which the Confrontation Clause applied, is defined as " '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " *Id.* That decision did not, however, delineate precisely what statements qualify as "testimonial." *Id.* at 51–52. Rather, *Crawford* identified several possible examples of statements that qualify as testimonial in nature, including " 'extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,'; [and] 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial ...'." *Id.* at 51–52. The Supreme Court did not adopt a particular definition, however, noting only that "some statements qualify under any definition." *Id.* at 52.

Following *Crawford*, the contours of what sorts of statements qualify as "testimonial" was further developed in *Melendez–Diaz*. There, the Supreme Court determined that a forensic laboratory report certifying that evidence found in a defendant's car was a narcotic was testimonial in nature. In describing why the certification was testimonial, the majority explained that each

---

[2] After petitioner's conviction, the United States Supreme Court held that the confrontation clause "has no application to out-of-court statements that are not offered to prove the truth of the matter asserted" and the jury is instructed accordingly. *Williams v. Illinois*, 132 S. Ct. 2221, 2228 (2012). Thus, "[u]nder settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true." *Id.* However, the Court noted that an out-of-court statement is testimonial if it has "the primary purpose of accusing a targeted individual of engaging in criminal conduct" and, usually, it involves a "formalized statement[ ] such as affidavits, depositions, prior testimony, or confessions." *Id.* at 2242. To the extent Petitioner relies upon *Williams*, 132 S.Ct. 2221 (2012), that decision can form no part in the instant analysis because *Williams* was rendered after the court of appeals issued its decision in this case. *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011) ("[Section] 2254(d)(1) requires federal courts to "focu[s] on what a state court knew and did," and to measure state-court decisions "against this Court's precedents *as of* '*the time the state court renders its decision*.' ") (citations omitted; emphasis in original). But even were the Court to consider *Williams*, Altes concedes that case is not dispositive of his claim. (Reply at 4.)

11

certificate was (1) "a ' "solemn declaration or affirmation made for the purpose of establishing or proving some fact" ' ", (2) "functionally identical to live, in-court testimony" (*id.* at 310–311), (3) " 'made under circumstances which would lead an objective witness reasonably to believe that [it] would be available for use at a later trial' " (*id.* at 311), and (4) created "to provide 'prima facie evidence of the composition, quality, and the net weight' " of the substance found in the plastic bags seized from the defendant's car.  The report had been created specifically to serve as evidence in a criminal proceeding.  *See Bullcoming*, 131 S.Ct. 2705, 2709 (2011).  *Melendez–Diaz*, however, held only that the lab report could not be admitted without a witness appearing to testify in person.  *See Flournoy v. Small*, 681 F.3d 1000, 1004-1005 (9th Cir. 2012).

The debate over whether particular statements are testimonial continued.  In 2011, in *Bullcoming v. New Mexico*, 131 S.Ct. 2705 (2011), the Supreme Court determined that a forensic laboratory report (there, a blood alcohol concentration report), made for the purpose of proving a particular fact, was testimonial in nature.  In a four-one-four decision, Justice Sotomayor authored the decisive concurrence.  In her separate, concurring opinion, she specifically identified Confrontation Clause questions that remained unanswered by *Bullcoming*.  These unresolved areas included the treatment of experts providing opinion testimony based on others' testimonial reports not admitted into evidence.  *See id.* at 2722 ("We would face a different question if asked to determine the constitutionality of allowing an expert witness to discuss others' testimonial statements if the testimonial statements were not themselves admitted as evidence.").

Thus, at the time the state court of appeals considered whether Dr. Ogan's testimony concerning the Peterson Report presented a potential Sixth Amendment violation, the jurisprudential landscape for determining whether Dr. Ogan's statements were testimonial in nature was not clearly established for purposes of this Court's limited review.  *See id.* at 2722 (Sotomayor, J., concurring).

### c.  Application

As distinguished from *Bullcoming*, the facts of this case are one step further removed from the unresolved constitutional conflict Justice Sotomayor posited:  the report upon which Ogan relied *was* admitted into evidence – with Altes's trial counsel's agreement once the foundation was

United States District Court
Northern District of California

established.  (RT at 1254:22-26; *see supra* note 1.)  Here, the prosecutor offered a redacted portion of a certified autopsy report, specifically only that portion consisting of the "anatomic diagnosis" and the medical examination itself.  (RT 1239:3-4, 21-25, Exh. 236.)  The redacted report excluded the write-up from the sheriff's department and the lab test results.  (RT 1239: 13-18.) This redacted portion was offered and admitted as an exception to the hearsay rule as a business record and an official record.  (RT 1239:3-4, 1253:6-1254:25.)

To establish foundation for the redacted report, Dr. Ogan testified that he worked with a group of private practice pathologists based in Fairfield, California who were under contract with the coroner, an elected official, to perform all the autopsies for Contra Costa County.  They were under contract with over ten other counties in California as well.  (RT 1245:3-15, 1251:19-22.) Importantly, these pathologists were an independent medical group and responsible for performing *all* autopsies in the county regardless of whether the cause of death was the result of natural causes or criminal conduct.  (RT 1249:2-1250:21.)  While Dr. Ogan testified that the routine process used included receipt of a brief summary of law enforcement's own initial investigation, there is no indication that it impacted the anatomic diagnosis or medical examination. (RT 1249:27-1250:18.) Nor was that portion admitted or the subject of testimony.  Further, Dr. Ogan confirmed that he met separately with defense counsel.  (RT 1297:18-1298:5.)

Dr. Ogan's testimony as it relates to the admitted Peterson Report contained not only the anatomic diagnosis, and the description of the medical examination, but reiterated Dr. Peterson's own observations and independent conclusions.[3]  The Court finds that the testimony regarding the

---

[3] Although the court of appeals noted that this evidence was testimonial and its admission absent an opportunity to cross-examine thus would have implicated Altes's rights under the Confrontation Clause, this conclusion has been drawn into doubt by intervening California Supreme Court authority in *People v. Dungo*, 55 Cal.4th 608 (2012) (holding that certain statements in autopsy report are not testimonial). *Altes*, at *7.   In a trilogy of cases, the California Supreme Court attempted to create some parameters for determining whether statements violated the Confrontation Clause.  In *Dungo*, a majority of the justices distinguished between statements which merely recorded objective facts with conclusions, such as the cause of death. *Dungo*, 55 Cal.4th at 619.  Further, even crediting the concerns raised in Justice Corrigan's dissent, the foundation for the autopsy report here mitigates against a finding that it was prepared for purposes of prosecution.

United States District Court
Northern District of California

United States District Court
Northern District of California

latter violated the Confrontation Clause.  That said, it also finds that the remainder of the court of appeals' decision on this issue was not unreasonable based on the factual record, nor did involve an unreasonable application of Supreme Court precedent at that time.  The court of appeals reasonably found that Dr. Ogan testified extensively on his own opinions and analysis based on unchallenged record evidence, including photos showing Gutierrez's injuries and the bullet entry point.  For such testimony, Dr. Ogan was not a "mere conduit" for Peterson's opinions, but rather offered his own knowledge and expertise.  Dr. Ogan was available for cross-examination on these opinions.  This Court thus finds that there was no Confrontation Clause issue as to the balance of the testimony.

The Court further agrees that while Dr. Ogan's testimony relating Dr. Peterson's opinions did constitute a violation, such testimony was not prejudicial.  Such testimony was exceedingly limited and paled in comparison to Dr. Ogan's own evaluation based on the factual record presented in this case.  Moreover, such evidence cannot be reasonably understood as having a material impact on the outcome, given the overwhelming evidence of Altes's guilt.  Dr. Ogan testified independently regarding his conclusion that the single bullet wound to Gutierrez's body severed a major artery and resulted in his death.  In addition, the offending opinion testimony was cumulative of evidence already admitted, given that the Peterson Report had been admitted into evidence without objection.  In light of this, and other record evidence, Dr. Ogan's testimony relating Peterson's opinions was not prejudicial.

Petitioner's request for relief on this basis is therefore **DENIED**.

**B.  Second Claim:  *In Limine* Rulings**

**1.  Rulings and Timing Thereof**

Petitioner next claims that he was denied due process when the trial judge issued new rulings on pretrial evidentiary motions previously decided by the judge initially assigned to the case.  The court of appeal addressed this argument and summarized the relevant *in limine* proceedings as follows:

> Altes asserts the trial court violated his due process rights when it ruled on pretrial evidentiary motions that had been previously considered and decided by the judge initially assigned to the case.

14

This contention, too, was forfeited.

The case was originally assigned to the Honorable John Sugiyama. At the start of the trial Judge Sugiyama heard and ruled on a number of motions in limine. These included a *Miranda* motion as well as rulings concerning admissibility of prior convictions, uncharged prior acts by Gutierrez and others, post-mortem photographs, and psychiatric testimony. Judge Sugiyama subsequently granted a defense request for a continuance, and told the parties that the Presiding Judge would decide whether the case would ultimately be reassigned to the same department for trial.

Trial recommenced four months later before the Honorable Jill Fannin. The prosecutor filed a brief arguing that Judge Sugiyama's motions in limine had no binding effect on Judge Fannin because they were interim rulings subject to reconsideration and modification at any time prior to submission and were based on the state of the case five months earlier. Altes did not file an opposition.

The following colloquy took place before Judge Fannin. "The Court: I think both parties agree that [Judge Sugiyama's rulings] were interim rulings. [The prosecutor] submitted a brief to that effect. So I don't want to hear about how Judge Sugiyama ruled— [Defense Counsel]: Well, but I think—The Court:—because it's not binding on me. [Defense Counsel]: *True*. The Court: So I don't want to hear about it. [Defense Counsel]: Even if there's no new information? The Court: Correct. I just don't want to hear about it." (Italics added.) Judge Fannin proceeded to rule on the in limine motions.

And no wonder, because defense counsel expressly agreed that Judge Sugiyama's rulings were not binding. Altes's claim on appeal that his follow-up query—"Even if there's no new information?" — was an objection reads more into the record than we can find. While Altes asserts his lawyer "over and over again objected to each of the specific rulings made by the trial court that conflicted with Judge Sugiyama's prior rulings," not one of those objections was based on an argument that the earlier rulings were binding. Altes's failure to assert that claim at trial resulted in its forfeiture for appeal. (See, e.g., *People v. Cunningham* (2001) 25 Cal.4th 926, 989; *People v. Neely* (1999) 70 Cal.App.4th 767, 781.)

*Altes*, 2011 WL 6089716, at *7.

Altes does not address the forfeiture finding that was the basis for the state court of appeals' decision. Instead, Altes claims that by reconsidering and altering Judge Sugiyama's original pre-trial rulings, Judge Fannin denied petitioner's "Fifth, Sixth and Fourteenth

Amendment right to present a defense." (Petition at 28.)  The government argues that Altes's due process claim was properly found to have been procedurally defaulted and, in any event, is meritless.  (Answer at 12-15.)  Petitioner does not address the government's arguments in his reply.

### 2.  Legal Standard

The issue presented is whether habeas relief is barred on the ground that Altes did not object to Judge Fannin's reconsideration of Judge Sugiyama's earlier motion *in limine* rulings.

California's contemporaneous objection requirement is independent of federal law. Pursuant thereto, a defendant must make a timely and specific objection at trial in order to preserve a claim for appellate review.  *See, e.g.,* Cal. Evid. Code § 353; *People v. Ramos,* 15 Cal.4th 1133, 1171 (1997); *People v. Green,* 27 Cal.3d 1, 27 (1980).  The Supreme Court has acknowledged that a state court's application of the contemporaneous objection rule may constitute grounds for default.  *See Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  Moreover, the Ninth Circuit has confirmed that the contemporaneous rule is independent, and has honored defaults for failure to comply with the rule.  *See Vansickel v. White*, 166 F.3d 953, 957-58 (9th Cir. 1999); *Bonin v. Calderon*, 59 F.3d 815, 842-43 (9th Cir. 1995); *Hines v. Enomoto*, 658 F.2d 667, 673 (9th Cir. 1981).

A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment.  *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991).  "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement."  *Id.*  Federal habeas review of the procedurally defaulted claims is barred unless the prisoner can demonstrate: (1) cause for the default; *and* (2) actual prejudice as a result of the alleged violation of federal law; or (3) that the failure to consider the claims will result in a fundamental miscarriage of justice.  *Id.* at 750 (emphasis supplied).

### 3.  Analysis

Altes does not challenge the court of appeals' determination that he procedurally defaulted

16

1    the instant claim.  Rather, he argues as if on a blank slate:  Judge Fannin was not free to amend

2    previous motion in limine rulings[4], and her decision to do so resulted in actual prejudice.  As set

3    forth above, however, the state appeals court found that Altes had defaulted on this claim for

4    failure to object at trial.  Thus, this Court reviews petitioner's claim to assess whether he has

5    sufficiently demonstrated a basis for surmounting the bar against habeas relief for defaulted

6    claims:  cause for the default and actual prejudice, or a fundamental miscarriage of justice.

7    *Coleman*, 501 U.S. at 750.

8        The Court finds that Altes has failed to demonstrate that this standard has been met.  In his

9    reply, Altes does not address the government's argument at all.  In his petition, he does not

10   provide any cause for default, nor does he argue that a fundamental miscarriage of justice would

11   result if this Court did not look beyond the state court's determination of procedural default.  *See*

12   *Coleman*, 501 U.S. at 750.  Construed liberally, the Court understands Altes to argue that he

13   suffered actual prejudice by Judge Fannin's *in limine* rulings.  Altes argues that Judge Fannin's

14   rulings excluded evidence that was crucial to his self-defense argument, or included evidence

15   compelling a guilty verdict.  Altes specifically identifies three of Judge Fannin's rulings that: (1)

16   the testimony of Dr. Wornian, a defense psychiatrist, had no applicability to the subjective

17   component of petitioner's self-defense theory; (2) photographs of Gutierrez's body were

18   admissible; and (3) Gutierrez's thieving to support a drug habit was inadmissible.  (Petition at 28.)

19       Notwithstanding state procedural law, the Court is not persuaded.  As an initial matter, the

20   Court finds that evidence concerning Gutierrez's theft and drug use came before the jury in other

21   ways, for example, through the testimony of Brenda Smith and Michael Molina.  As a practical

22   matter, Altes has not demonstrated prejudice because evidence he claims should have been

23   presented was presented.

24   ───────────────

25       [4] As to Altes's argument that Judge Fannin was not at liberty to amend previous *in limine*
     rulings, the Court finds such argument unfounded as a matter of California law.  "[A] ruling on a
26   motion *in limine* is not generally binding on the trial court, which is free to reconsider its ruling at
     the time the challenged evidence is offered, [and] the failure to object normally constitutes a
27   waiver."  *People v. Karis*, 46 Cal. 3d 612, 635 n.16 (1988) (citing cases).  Moreover, Altes's
     counsel expressly agreed that Judge Fannin was not bound by the previous *in limine* rulings.
28

Altes was furthermore able to present his self-defense theory during the trial, including in closing statements and through his videotaped interview with police. In that interview, Altes explained that he "went outside to warn Gutierrez that he had 24 hours to return [. . .] stolen tools." *Altes*, at *2. When Altes returned to his workshop, Gutierrez was there. As the court of appeal recounted, the video showed Altes explaining:

> Gutierrez grabbed a pellet rifle and tried to shoot at Altes, but the pellet rifle also misfired. Gutierrez began swinging the pellet rifle like a club, hitting Altes once on the shoulder and breaking the barrel. Altes aimed his revolver at Gutierrez's groin, intending to shoot him in "[h]is balls, his huevos," and pulled the trigger. Gutierrez fell to the ground. Altes returned to the house with the pellet gun and told his parents he had shot Gutierrez because Gutierrez tried to shoot him with it.

*Id.* Furthermore, in closing statements, defense counsel argued strenuously that Altes's self-defense theory related to Gutierrez's theft and drug use.

Separately, the Court finds that the jury was presented with overwhelming evidence of Altes's guilt, namely, Altes' previously referenced admission (CT 1014) and Dr. Ogan's independent assessment that the single bullet wound to Gutierrez's body severed a major artery and resulted in his death. That the universe of evidence contained overwhelming evidence of guilt, *despite* the inclusion of evidence bolstering Altes's theory of self-defense, renders it improbable that any prejudice resulted from Judge Fannin's *in limine* rulings. Petitioner's request for habeas relief on this ground is **DENIED**.

### C. Third Claim: Limitation on Evidence of Theft and Drug Use

#### 1. Scope at Issue

Next, Altes contends that he was denied his right to present a defense when the trial court limited the use of evidence of Gutierrez's involvement with drugs and theft.[5]

---

[5] In his petition, Altes also appears to assert that such evidence was excluded from the trial. (Petition at 29-33.) As discussed herein, that is not so. Rather, the trial court limited the use of such evidence because it determined that evidence of Gutierrez's theft and drug use was not relevant to Altes's self-defense theory unless Altes knew of such evidence. Accordingly, the trial court permitted such evidence to come before the jury to the extent that it was relevant to Altes's state of mind.

United States District Court
Northern District of California

1    The state court of appeal considered this issue, and addressed it as follows:

2

3    Altes also maintains the court should have let him support his self
     defense theory with evidence that Gutierrez abused drugs because "a
4    drug user's behavior on a particular occasion is likely to be more
     violent, more irrational and more unpredictable on a particular
5    occasion than a non-drug user's" and "[t]hat knowledge may well
     have factored into [Altes's] fear and state of mind" when he killed
6    Gutierrez.  This argument, too, fails for the simple reason that the
     court admitted the evidence Altes asserts was excluded.  The court
7    ruled: "I have said repeatedly that Pablo Gutierrez's past is not
     relevant character evidence.  The only way it would come in,
8    whether or not there was a theft or anything else, *would be if it was
     relevant to the defendant's state of mind.*  [¶] ...[¶]  And I don't
9    know that this—you haven't given an offer of proof that this witness
     would say she's had conversations with Mr. Altes about the drug
10   usage, nothing like that.  So, at this point I don't have anything to go
     on about how it affects Mr. Altes' frame of mind. [¶]  I keep asking
11   you for ... where the drug usage of Pablo Gutierrez—where that
     goes with regard to Mr. Altes' frame of mind. [¶]  Do you have an
12   offer of proof on that?" (Italics added.)  Defense counsel responded
     that the witness would say she had discussed Gutierrez's drug use
13   with Altes.  The court continued: "Okay.  So I would allow a limited
     inquiry into that with regard to what Mr. Altes supposedly knew
14   very soon before the incident. [¶].... [¶] *As I said earlier, to the
     extent the fact—the fact that Mr. Altes may have thought the victim
15   was stealing or the fact that he thought the victim was using drugs in
     the few months before the incident, it would not come in for the
16   truth.  It would only come in for Mr. Altes' state of mind.*" (Italics
     added.)
17

18   On the other hand, the court's exclusion of evidence *not* linked to
     Altes's state of mind was proper.  Absent an offer of proof that Altes
19   was aware of it, evidence that Gutierrez used drugs was not
     admissible to support his claim of self-defense.  (*People v. Tafoya*
20   (2007) 42 Cal.4th 147, 165–166; *People v. Minifie* (1996) 13 Cal.4th
     1055, 1065–1069.)
21

22   Altes's claim that the court erroneously excluded evidence of
     Gutierrez's reputation for theft fails for the same reasons.  The court
23   allowed evidence about Gutierrez's alleged thievery to the extent it
     was relevant to Altes's state of mind, but otherwise excluded it as
24   inadmissible propensity evidence.  That ruling was correct. (*People
     v. Tafoya, supra,* 42 Cal.4th at pp. 165–166.)

25   *Altes*, 2011 WL 6089716, at *5–6 (emphasis in original).

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2.  **Legal Standard**

2     Federal habeas review does not permit review of a state court's evidentiary ruling unless it

3  was so prejudicial as to constitute a violation of due process.  *Estelle v. McGuire*, 502 U.S. 62, 67

4  (1991); *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991); *see also Henry v. Kernan*,

5  197 F.3d 1021, 1031 (9th Cir. 1999) ("Even where it appears that evidence was erroneously

6  admitted, a federal court will interfere only if it appears that its admission violated fundamental

7  due process and the right to a fair trial.").  Even if an evidentiary error is of constitutional

8  dimension, the court must consider whether the error was harmless under *Brecht v. Abrahamson,*

9  507 U.S. 619 (1993).

10          3.  **Analysis**

11    Altes argues that the trial court committed prejudicial error when it conditioned the

12 admissibility of Gutierrez's prior acts of violence on petitioner's awareness of them.  Altes claims

13 this evidence should have been admitted, without limitation, to "corroborate" the "reasonableness"

14 of the his state of mind.  *See Altes*, 2011 WL 6089716, at *5.  (Petition at 33.)  The government

15 contends that the trial court properly allowed evidence of Gutierrez's theft and drug use to the

16 extent it was relevant to petitioner's state of mind, but otherwise correctly excluded such evidence

17 as inadmissible propensity evidence.  (Answer at 17.)  Altes does not respond to this argument in

18 his reply.

19    Having reviewed the arguments, the Court finds that petitioner's claim lacks merit because

20 he has failed to show any prejudice, much less prejudice so substantial as to constitute a violation

21 of due process.  *See Estelle*, 502 U.S. at 67.  First, the trial court admitted evidence of Gutierrez's

22 drug use and theft to the extent that it was probative of Altes's state of mind.  Second, in light of

23 this and other evidence, the Court finds that there was overwhelming evidence of Altes's guilt and

24 that admitting such evidence without this limitation would not have affected the outcome at trial.

25    On the first issue, the state trial court's decision to limit evidence of Gutierrez's prior acts

26 based on petitioner's knowledge as required for his theory of self-defense was not so prejudicial as

27 to constitute a violation of due process because the trial court allowed him to introduce this

28 evidence to the extent that he was aware of it.  Thus, as a matter of definition, the evidence

20

United States District Court
Northern District of California

1    admitted concerning Gutierrez's drug use and thievery was only that directly relevant to Altes's

2    state of mind, and thus, of aid to his claim of self-defense.  Evidence of Gutierrez's thievery and

3    drug use, of which Altes was not aware when he shot Gutierrez, was simply not relevant to

4    petitioner's state of mind or the reasonableness of his belief that self-defense was necessary.  *See*

5    *Altes*, 2011 WL 6089716, at *6 (citing *People v. Tafoya*, 42 Cal. 4th 147, 165–66 (2007)).  In light

6    of this limitation, the defense was able to offer proof of Gutierrez's theft and drug use through

7    Brenda Smith, Molina, and a letter Gutierrez wrote.  The jury was also informed that Gutierrez's

8    girlfriend, Trolesi, had a history of drug dealing, as did Molina.  Moreover, Altes told police that

9    he believed that Gutierrez stole tools from him to buy drugs.

10          In sum, the jury heard relevant evidence that at the time he shot Gutierrez, Altes believed

11    Gutierrez to be a drug user and a thief.  Any further evidence "corroborating" Altes's belief that

12    Gutierrez had a history of drug use and theft would have been cumulative.

13          Moreover, the inclusion of less relevant evidence (although as to Altes's self-defense

14    argument, evidence of which Altes was not aware would be irrelevant to his defense) would not

15    have overcome the bevy of evidence supporting the jury's ultimate decision.  Put differently, the

16    addition of other evidence, even if "corroborative," would not have raised a reasonable probability

17    that the jury would find that Altes had acted in self-defense.  Evidence was submitted to the jury

18    concerning Altes's statement to the police – including that his only regret was not using a bigger

19    gun, and witnessed his demeanor when he gave that interview.  So, too, was the jury made aware

20    of the events leading up to the fatal gunshot: that Altes went into the house to retrieve the .22

21    caliber, aimed the revolver at Gutierrez's groin intending to shoot him in "[h]is balls, his huevos,"

22    and pulled the trigger.  The jury was also informed of the manner in which Altes treated Gutierrez

23    after he had shot him.  The jury heard evidence that Altes sprayed Gutierrez with a hose while

24    Gutierrez lay on the ground, telling Gutierrez to "get up, you worthless piece of shit" and that

25    Altes told Gutierrez's friends, Molina, Trolesi, and Winn, to "get him out of here or I'm going to

26    dump him in the delta."  Furthermore, the jury heard that Altes had placed Gutierrez on the floor

27    of his vehicle under a plastic bag in order to transport him to a gas station.

28          Accordingly, petitioner's claim based on due process violations based on the trial court's

21

limitation of evidence of Gutierrez's prior drug use and thievery is **DENIED**.

### D.  Fourth Claim:  Ineffective Assistance of Counsel

Altes claims his defense counsel rendered ineffective assistance by failing to: (i) introduce Andy Gartelman's preliminary hearing testimony; (ii) call Dr. Wornian as a witness; (iii) call Michael Molina as a defense witness; and (iv) "cogently present the self-defense theory." Petitioner further argues that the cumulative effect of the defense counsel's failures warrants habeas relief.  The government contends Altes takes issue with tactical decisions by defense counsel and that he cannot show prejudice because any testimony was essentially cumulative. (Answer at 20-26.)  These claims were not raised before the state court of appeal.

#### 1.  Legal Standard

Claims of ineffective assistance of counsel are examined under *Strickland v. Washington*, 466 U.S. 668 (1984).  In order to prevail on a claim of ineffectiveness of counsel, petitioner must establish two factors.  First, petitioner must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  *Id.* at 687–68.  The standard for counsel's performance is "not whether it deviated from best practices or most common custom."  *Harrington v. Richter*, 131 S. Ct. 770, 778 (2011).  "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance."  *Id.* at 787 (quoting *Strickland*, 466 U.S. at 689).

Second, petitioner must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id.* Where the defendant is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id.* at 695.  "The likelihood of a different result must be substantial, not just conceivable."  *Richter*, 131 S. Ct. at 792 (citing *Strickland*, 466 U.S. at 693).

The standards of both 28 U.S.C. section 2254(d) and *Strickland* are "highly

United States District Court
Northern District of California

1    deferential . . . and when the two apply in tandem, review is doubly so." *Richter*, 131 S. Ct. at 788

2    (quotation and citations omitted).  When section 2254(d) applies, "the question is not whether

3    counsel's actions were reasonable.  The question is whether there is any reasonable argument that

4    counsel satisfied Strickland's deferential standard." *Id.*

5            **2.  Analysis**

6            **i.  Failure to Introduce Andy Gartelman's Preliminary Hearing Testimony**

7            Petitioner claims that the defense counsel was deficient because Andy Gartelman's

8    preliminary hearing testimony was not introduced at trial.  (Petition at 1.)  Gartelman could not

9    testify at trial because he died of a heart attack.  (CT 388.)  The trial court made three rulings,

10   ultimately resulting in the defense counsel's decision not to introduce any of Gartelman's

11   testimony: (1) the trial court excluded as hearsay Gartelman's statement that in the van, petitioner

12   said that Gutierrez tried to shoot and hit him with the pellet gun (CT 17–18); (2) the trial court

13   found that Gartelman's statements to Detective Barnes before the preliminary hearing did not

14   qualify as prior consistent statements (RT 1849–62); and the trial also court found that some of

15   Gartelman's statements were prior inconsistent statements, and thus inadmissible.  (RT 1883–

16   1905.)  As a result of these rulings, the defense counsel declined to introduce any part of

17   Gartelman's testimony through a redacted preliminary hearing transcript during trial because it

18   "seem[ed] nonsensical and it's unpersuasive by itself without the prior consistent statement."  (RT

19   1875.)

20           Petitioner claims that Gartelman's preliminary hearing testimony should have been

21   presented for three reasons.  First, the testimony would have shown that petitioner was uncertain

22   and confused if he actually shot Gutierrez, countering the comments that petitioner made to the

23   police during his interview.  (Traverse at 11–12.)  Second, Gartelman's testimony would have

24   provided an alternative view of Gutierrez's friends, Molina, Trolesi, and Winn.  (*Id.* at 12.)

25   Whereas their testimony at trial gave the impression that they quickly came to the aid of their

26   friend, Gartelman's testimony would have showed that they were indifferent to Gutierrez's

27   situation and that they "didn't want nothing to do with it."  (*Id.*)  Lastly, Gartelman's testimony

28   would have shown that petitioner acted quickly to provide Gutierrez with medical assistance by

United States District Court
Northern District of California

getting the attention of a nearby ambulance on their way to the hospital, countering the prosecution's presentation that petitioner displayed callous indifference to Gutierrez.  (*Id.*)  In sum, petitioner claims that it was strategically unreasonable for the defense counsel not to introduce Gartelman's testimony.

The defense counsel's strategic decision not to introduce the Gartelman preliminary hearing testimony was reasonable.  The defense counsel is empowered to make such strategic decisions, so long as they are reasonable and informed.  *See Jennings v. Woodford*, 290 F.3d 1006, 1014 (9th Cir. 2002).  This decision was made after the defense counsel had time to evaluate fully the benefit of Gartelman's testimony in light of the trial court's rulings.  (RT 1921.)  Given that Gartelman's testimony would have been provided to the jury out of context and without support of his prior consistent statement, the defense counsel's strategic decision not to introduce his testimony was reasonable.

Moreover, defense counsel's decision not to introduce Gartelman's testimony was not prejudicial.  To the extent Altes contends that Gartelman could have corroborated Altes's self-defense theory, Gartelman's testimony was cumulative in light of Altes's statement and Altes's father's testimony that Gutierrez had tried to shoot Altes.  (RT 539.)  To the extent Gartelman would have undermined the credibility of other witnesses, Gartelman lived on the Altes' property and he was a "very good friend" thus bearing on his credibility.  (RT 413, 909.)  Even so, Gartelman's testimony confirmed certain facts unfavorable to Altes, for example, that Altes did not want to call 911, and that Molina had been to one to suggest calling 911.

Finally, the evidence of guilt in this case is overwhelming.  The jury heard of how Altes treated Gutierrez after he was shot, that he expressed coldness and disregard for Gutierrez, and that his only regret was not using a bigger gun.  Furthermore, other record evidence undermines Altes's claim of self-defense.  As Molina testified, at the scene after the shooting, "the main reason why he [Altes] said it happened was over some tools that were stolen from his property." (RT 461.)  Any testimony from Gartelman would not have overcome the abundant evidence of Altes's guilt.  Petitioner has not shown that the likelihood of a different result is substantial enough to support a finding of ineffective assistance of counsel.

1

###     ii.     Failure to Call Dr. Wornian as a Witness

2        Altes next argues that Dr. Wornian's report and testimony should have been presented at

3    trial.  (Petition at 1.)  Dr. Wornian is a psychiatrist who examined petitioner to determine his

4    competency to stand trial, and later evaluated Altes's psychological and psychiatric function

5    insofar as it bore on the commission of the act for which he was charged.  (CT 204.)  In his

6    petition, Altes does not explain on what basis he believes Dr. Wornian's testimony would have

7    aided his defense.  In his reply, he offers more clarity.  Altes appears to contend that Dr. Wornian

8    could have corroborated Altes's claim that he had been acting in self-defense, that he had gotten

9    the .22 caliber revolver only to frighten Guttierez, and because Altes had told Dr. Wornian that he

10   wanted the jury to determine if he had acted in self-defense.  (Reply at 12-13 (citing RT 1733-34;

11   1741-1742).)  Petitioner claims that Dr. Wornian's "testimony could have provided importance

12   evidence on [petitioner's] intent," which could have been crucial in the jury's deliberations.

13   (Reply at 13.)

14       The Court finds that defense counsel's decision not to call Dr. Wornian was a tactical

15   decision that did not fall below an objective standard of reasonableness.  The trial court gave

16   defense counsel an opportunity to evaluate Dr. Wornian's testimony in light of its rulings.  (RT

17   1798.)  Defense counsel indicated that he had talked this issue over with a supervisor that day, and

18   was still unsure if he wanted to call Dr. Wornian as a witness, but that by the following day he

19   would have spoken again with his supervisor to make a final decision.  (RT 1799–1801.)  The next

20   day, the defense counsel said that he was "very close" to making a decision regarding whether or

21   not he would call Dr. Wornian, and that he had "thought about it long and hard."  (RT 1915.)  The

22   defense counsel did not call Dr. Wornian as a witness before resting the defense case.  (RT 1924.)

23       Defense counsel did not perform below an objective standard of reasonableness, and there

24   is no reasonable basis that Dr. Wornian's testimony would have provided the jury "a reasonable

25   doubt respecting guilt."  *Strickland*, 466 U.S. at 695.  To the extent Altes maintains that Dr.

26   Wornian would have supported his self-defense theory, the jury heard evidence of Altes's self-

27   defense theory in other forms.  Specifically, Altes's father testified that Gutierrez tried to shoot

28   Altes, and Altes related the same in his videotaped interview; Dr. Wornian's testimony on this

1   point would have been cumulative.  Moreover, Altes's speculation that Dr. Wornian would have

2   related Altes's belief that retrieving the gun was not an "overtly lethal move," does not raise a

3   reasonable doubt respecting the jury's verdict.   Even assuming Dr. Wornian would have testified

4   as Altes claims, such testimony could have drawn into question Altes's credibility, and

5   compromising Altes's credibility could have negatively impacted his self-defense argument.

6          Separately, Altes was not prejudiced by the defense counsel's actions.  Dr. Wornian's

7   allowed testimony would not have overcome the weight of evidence that petitioner intentionally

8   shot Gutierrez, and as stated above, the jury was already made aware that Altes claimed Gutierrez

9   had tried to shoot him.

### iii.   Failure to Call Michael Molina as a Defense Witness

11         Petitioner claims that Michael Molina, Gutierrez's friend, should have been called as a

12   defense witness to support petitioner's self-defense claim.  (Reply at 13–14.)  Molina was called to

13   the scene after Gutierrez was shot.  (RT 446–48.)  He testified that he was a good friend of

14   Gutierrez.  When Molina arrived at the scene, Gutierrez was rolling on the ground holding his

15   stomach.  Altes was spraying Gutierrez down with a hose and telling Gutierrez to, "get up, you

16   worthless piece of shit."  (RT 455.)  Altes told Molina to "get him out of here or I'm going to

17   dump him in the delta."  (*Id*.)  According to Molina, Altes's demeanor was "cold," and "like he

18   didn't want to deal with anything ... like he didn't care."  (RT 460.)

19         Molina was called as a witness by the government, but the trial court limited the defense

20   counsel's cross-examination.  (RT 511–15.)  Defense counsel did not call Molina as a witness

21   before resting his case.  Petitioner claims that Molina would have corroborated Altes's self-

22   defense claim by testifying that he had heard Altes tell the police officer that Gutierrez had tried to

23   shoot him.  (Reply at 13–14.)

24         Defense counsel's decision not to recall Molina as a defense witness did not fall below an

25   objective standard of reasonableness.  Petitioner appears to speculate that Molina would have

26   testified that he heard Altes tell the police that Guttierez tried to shoot him first, but provides no

27   citation to substantiate this claim.  Leaving aside the question of whether such testimony would

28   have been deemed admissible, it is not clear to the Court what basis exists for Altes's belief that

United States District Court
Northern District of California

1    Molina would have testified that he had heard Altes tell the police that Gutierrez tried to shoot

2    him.  Even if Molina had testified as Altes claims, such testimony would have been cumulative,

3    given that Altes himself made similar statements to police during his interview, and that Altes's

4    father testified that Gutierrez had tried to shoot Altes.

5    Moreover, Altes was not prejudiced by the defense counsel's performance.  In light of the

6    overwhelming evidence of guilt, is unreasonable to suggest that Molina's testimony – even

7    assuming it would have comported with Altes's suggestion – would have changed the outcome of

8    the trial.  Indeed, calling Molina as a witness would have likely permitted further testimony on

9    Altes's cold and detached demeanor, and Altes's explanation that the shooting had happened

10   because Gutierrez had been stealing Altes's tools.

11              **iv.    Failure to Cogently Present the Self-Defense Theory**

12   Finally, petitioner claims that the defense counsel failed to "cogently present the self-

13   defense theory of the case to the jury or the court."  (Petition at 35.)  Petitioner does not claim that

14   the defense counsel failed to present the self-defense theory.  Instead, petitioner claims that the

15   self-defense theory was not clearly presented.

16   To make an ineffective assistance of counsel claim, petitioner "must identify the acts or

17   omissions of counsel that are alleged not to have been the result of reasonable professional

18   judgment." *Strickland*, 466 U.S. at 690.  Petitioner has provided no cause to undermine the

19   presumption that the defense counsel's performance in presenting the self-defense theory is within

20   the wide range of reasonable professional assistance.  *See Richter*, 131 S. Ct. at 787 (quoting

21   *Strickland*, 466 U.S. at 689).

22   Petitioner has identified no specific acts or omissions to demonstrate defense counsel's

23   alleged deficiency.  To the contrary, the Court finds that the self-defense theory was cogently and

24   strenuously presented.  Defense counsel argued the self-defense theory throughout this case and

25   urged the trial court to reconsider rulings that negatively affected the self-defense theory.  The jury

26   was made aware of the self-defense theory throughout the trial.  Tellingly, defense counsel's

27   closing argument began with the following sentence: "The main issue here is self-defense."  (RT

28   2308.)  From there on, defense counsel used virtually the entirety of his closing statement to

United States District Court
Northern District of California

27

reinforce the self-defense theory.  Counsel walked through Gutierrez's history of violence, theft, and drug use, and explained what of that Bob Altes knew to support his claim of self-defense. (*See e.g.*, RT 2322-2328 ("So, number one, he's dealing with a thief.  He's dealing with somebody who is involved with drugs or addicted to drugs [. . .] we know that Bob knew he runs with the local drug dealer crowd [. . .] Pablo threatens others [. . .] Pablo came after Bob Altes").)  Counsel reviewed the legal bases for self-defense and defense of property.  Counsel then attempted to fashion explanations for some of the less than favorable evidence so as to support Altes's self-defense theory.  In sum, self-defense was Altes's theory of his case, and it reverberated throughout.  Accordingly, on appeal, the court recognized that the defense counsel maintained a self-defense argument throughout the proceedings.  *See Altes*, 2011 WL 6089716, at *3 ("Altes maintained that he shot Gutierrez in self-defense after Gutierrez attacked him with the pellet gun as he lawfully defended his property").

In sum, Altes has failed to show that the self-defense theory was not cogently presented.

### v.    Cumulative Effect

Petitioner argues that the cumulative effect from all of the defense counsel's failures satisfies the *Strickland* test because the evidence would have "bolstered petitioner's self-defense showing, making it reasonably probable that an outcome more favorable to petitioner would have resulted."  (Reply at 14.)  As set forth above, however, the Court finds none of Altes's claims rise to the level of a constitutional error.  Because no such error occurred, no cumulative prejudice is possible.  *See Hayes v. Ayers*, 632 F.3d 500, 523-24 (9th Cir. 2011).

Accordingly, Altes's petition for habeas relief on this basis is DENIED.

## IV.   CONCLUSION

The state court's adjudication of the claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Accordingly, the petition is DENIED.  A certificate of appealability will not issue.  Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

United States District Court
Northern District of California

Petitioner may seek a certificate of appealability from the court of appeal.  The Clerk shall enter judgment in favor of respondents and close the file.


**IT IS SO ORDERED.**

Dated:  May 28, 2015

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**